TOR PETERSEN, APPELLANT, v. NED
BRUEN, RESPONDENT.

No. 19878

May 10, 1990                                   792 P.2d 18

*Manoukian, Scarpello & Alling* and *Jeff E. Parker,* Carson City, for Appellant.

*Perry, Hebert & Spann* and *Thierry V. Barkley,* Reno, for Respondent.

---

[4]THE HONORABLE CLIFF YOUNG, Chief Justice, appointed THE HONORABLE E. M. GUNDERSON, Senior Justice, to sit in place of THE HONORABLE ROBERT E. ROSE, Justice.

## OPINION

By the Court, STEFFEN, J.:

The district court dismissed appellant Tor Petersen's complaint on the ground that it was time-barred by the statute of limitations. Petersen, seeking damages for injuries resulting from child sexual abuse (CSA), contends that the lower court erred in refusing to apply the "discovery rule" to toll the running of the statutory period. Convinced that Petersen is entitled to maintain his action, we reverse.

### Facts

Petersen was sexually abused by respondent, Ned Bruen, during the period from 1975 to 1983 when, under the auspices of the Big Brothers program, Bruen was assigned as a "big brother" to Petersen. The record reflects that Petersen, the "little brother," was approximately seven years old when the abuse commenced. Bruen exploited his relationship of trust with Petersen by seducing him and committing various acts of sexual battery upon his young victim. Bruen also memorialized his depravity by taking photographs of Petersen before, during and after Bruen's sexual trysts with his victim.

Petersen first sought help with his emotional and psychological problems in November of 1987, when he commenced psycho-

therapy. In the process of counseling with his psychiatrist, Petersen decided to apprise law enforcement officers of Bruen's criminal behavior. As a result of Petersen's disclosures and a subsequent investigation, Bruen was eventually convicted of sexual assault, attempted sexual assault, lewdness with a minor under the age of fourteen, use of a minor in producing pornography, and possession of child pornography.

Petersen filed a civil action against Bruen on July 20, 1988, claiming that he first realized the causal connection between Bruen's sexual impositions and his emotional and mental problems during his psychiatric treatment. Petersen's allegations against Bruen consisted of causes of action for battery and negligent and intentional infliction of emotional distress. In an affidavit submitted in opposition to Bruen's motion to dismiss, Petersen averred that he had blocked out the eight years of sexual molestations by Bruen until vividly recalled during his therapy. Petersen further recalled consenting to Bruen's overtures, not considering the acts offensive at the time, and suffering no physical injury from his encounters with Bruen.

The district court determined that Nevada's two-year period of limitations applied and dismissed Petersen's complaint. According to the record, Bruen last molested Petersen in 1983, approximately five years before Petersen filed his action. Petersen insists that the district court erred in dismissing his complaint because he did not discover the nexus between Bruen's behavior and his emotional distress until 1987. Having filed his complaint in July 1988, Petersen argues that his action was timely.

## Discussion

This appeal presents issues of first impression in Nevada. The narrow issue on appeal is whether the district court properly applied the statute of limitations to the facts of Petersen's case. NRS 11.190(4)(e) expressly declares that civil actions must be commenced within two years "for injuries to a person . . . caused by the wrongful act . . . of another."

In resolving the issue before us, it is necessary to consider the purposes served by statutes of limitation. Justice Holmes succinctly stated that the primary purpose of such statutes is to "[prevent] surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." Telegraphers v. Ry. Express Agency, 321 U.S. 342, 348-349 (1944). Although statutes of limitation are generally adopted for the benefit of individuals rather than public policy concerns, Kyle v. Green Acres at Verona, Inc., 207 A.2d 513, 519 (N.J. 1965), it has been stated that:

> Viewed broadly, . . . statutes of limitation embody important public policy considerations in that they stimulate activity, punish negligence, and promote repose by giving security and stability to human affairs. Thus, statutes of limitation rest upon reasons of sound public policy in that they tend to promote the peace and welfare of society, safeguard against fraud and oppression, and compel the settlement of claims within a reasonable period after their origin and while the evidence remains fresh in the memory of the witnesses.

51 Am.Jur.2d *Limitation of Actions* § 18 (1970) (footnotes and citations omitted).

Finally, it has been observed that "[s]tatutes of limitation find their justification in necessity and convenience rather than logic, and it has been said that they represent expedience rather than principles." *Id.* at § 19, p. 603 (citing Chase Secur. Corp. v. Donaldson, 325 U.S. 304 (1945)).

The general rule concerning statutes of limitation is that a cause of action accrues when the wrong occurs and a party sustains injuries for which relief could be sought. Nelson v. A.H. Robbins Co., 515 F.Supp. 623, 625 (N.D.Cal. 1981). An exception to the general rule has been recognized by this court and many others in the form of the so-called "discovery rule." Under the discovery rule, the statutory period of limitations is tolled until the injured party discovers or reasonably should have discovered facts supporting a cause of action. *See, e.g.,* Sorenson v. Pavlikowski, 94 Nev. 440, 443-444, 581 P.2d 851, 853-854 (1978) (in legal malpractice action, cause of action accrues when plaintiff sustains damage and discovers, or should discover, his cause of action); Prescott v. United States, 523 F.Supp. 918, 940-941 (D.Nev. 1981) ("Plaintiff who relies upon this delayed discovery rule must plead facts justifying delayed accrual of his action. The complaint must allege: (1) the time and manner of discovery, and (2) the circumstances excusing delayed discovery."), *aff'd,* 731 F.2d 1388 (9th Cir. 1984); Fidler v. Eastman Kodak Co., 714 F.2d 192 (1st Cir. 1983); Raymond v. Eli Lily & Co., 371 A.2d 170 (N.H. 1977).

The rationale behind the discovery rule is that the policies served by statutes of limitation do not outweigh the equities reflected in the proposition that plaintiffs should not be foreclosed from judicial remedies before they know that they have been injured and can discover the cause of their injuries. Plaintiffs

should be put on notice before their claims are barred by the passage of time. *See Fidler,* 714 F.2d at 198.

Jurisdictions that have considered the discovery rule in the context of adult survivors of CSA have reached differing conclusions.[1] The Wisconsin Court of Appeals balanced the policies of the discovery rule and the statute of limitations when determining whether the discovery rule should apply to cases of incestuous abuse. In Hammer v. Hammer, 418 N.W.2d 23 (Wis.Ct.App. 1987), *rev. denied,* 428 N.W.2d 552 (Wis. 1988), the court held "as a matter of law, that a cause of action for incestuous abuse will not accrue until the victims discover, or in the exercise of reasonable diligence should have discovered, the fact and cause of the injury." *Id.* at 26. In *Hammer,* the adult survivor of childhood sexual abuse did not understand the past and present impact of the sexual abuse until she sought psychiatric help. The court adopted the discovery rule for incest cases and remanded the case to determine whether the discovery rule was applicable to the victim. The court rejected the argument from the alleged abuser that the statute of limitations' protection was being eroded and defendants would be subject to meritless claims for alleged wrongdoing from many years past. In rejecting the argument, the court noted that to protect the adult sexual abuser at the expense of the child is an "intolerable perversion of justice." *Id.* at 27. The court reached this determination by balancing the victim's and the defendant's interests and concluding that "the injustice of barring meritorious claims before the claimant knows of the injury outweighs the threat of stale or fraudulent actions." *Id.*

On the other hand, Washington courts have decided that the discovery rule did not apply to cases similar to *Hammer.* Tyson v. Tyson, 727 P.2d 226 (Wash. 1986).[2] Although the *Tyson* ruling has been superseded by statute,[3] the opinion has been cited by

---

[1] Johnson v. Johnson, 701 F.Supp. 1363 (N.D.Ill. 1988); Meiers-Post v. Schafer, 427 N.W.2d 606 (Mich.Ct.App. 1988); E. W. v. D. C. H., 754 P.2d 817 (Mont. 1988); Tyson v. Tyson, 727 P.2d 226 (Wash. 1986); Hammer v. Hammer, 418 N.W.2d 23 (Wis.Ct.App. 1987), *rev. denied,* 428 N.W.2d 552 (Wis. 1988).

[2] *See also* Kaiser v. Milliman, 747 P.2d 1130 (Wash.Ct.App. 1988); Raymond v. Ingram, 737 P.2d 314 (Wash.Ct.App. 1987).

[3] The statute superseding *Tyson* states that

[A]ll claims or causes of action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within three years of the act alleged to have caused the injury or condition, or three years of the time the victim discovered or reasonably should have discovered that the injury or condition was caused by said act, whichever expires later.

West's RCWA § 4.16.340 (1988) (amending RCW 4.16.350 and adding a new section to RCW 4.16).

both Petersen and Bruen for the different viewpoints expressed by the majority and dissent. In *Tyson,* the Washington Supreme Court concluded that the discovery rule "should be adopted only when the risk of stale claims is outweighed by the unfairness of precluding justified causes of action." *Tyson,* 727 P.2d at 228. The court stated that it has previously applied the discovery rule in non-sexual abuse cases where there was objective, verifiable evidence of the original wrongful act and the resulting injury. Because there was no such evidence in *Tyson,* the court did not apply the discovery rule to the sexual abuse victim. *Id.* at 229.

Petersen argues that *Tyson* can be reconciled with the case at hand. He asserts that Bruen's criminal convictions, based upon the sexual abuse Petersen suffered, serve as an "objective manifestation" of Petersen's injuries. We agree that the concerns regarding objective evidence are satisfied by Bruen's convictions.

Courts in California and Montana have held that the discovery rule does not apply when the victims knew of the factual elements of their cause of action long before the statute of limitations ran. *See, e.g.,* DeRose v. Carswell, 242 Cal.Rptr. 368 (Cal.Ct.App. 1987); E. W. v. D. C. H., 754 P.2d 817 (Mont. 1988).

The case of Meiers-Post v. Schafer, 427 N.W.2d 606 (Mich. Ct.App. 1988), involved facts similar to those in the present action. The plaintiff filed an action against the defendant arising out of the sexual acts committed by the defendant which resulted in emotional harm to the plaintiff. The defendant admitted committing the sexual acts, thus there was no stale claim concern because of the objective evidence of the abuse. Furthermore, the Michigan Court of Appeals adopted a two-prong test when determining whether to allow the discovery rule to toll the statute of limitations in sexual abuse cases:

> (a) a plaintiff can make out a case that she has repressed the memory of the facts upon which her claim is predicated, such that she could not have been aware of the rights she was otherwise bound to know, and (b) there is corroboration for plaintiff's testimony that the sexual assault occurred.

*Id.* at 610.

Turning again to NRS 11.190(4)(e) and its application to Petersen's complaint, we first observe that this court has long recognized that:

> In order to reach the intention of the legislature, courts are not bound to always take the words of a statute either in their literal or ordinary sense, if by so doing it would lead to any absurdity or manifest injustice, but may in such cases modify, restrict, or extend the meaning of the words, so as to

> meet the plain, evident policy and purview of the act, and bring it within the intention which the legislature had in view *at the time it was enacted* (emphasis added).

Escalle v. Mark, 43 Nev. 172, 176, 183 P. 387, 389 (1919) (quoting Ex Parte Siebenhauer, 14 Nev. 365, 369 (1879)). *See also* Gibson v. Mason, 5 Nev. 283 (1869). The pertinent language of NRS 11.190(4)(e) was first enacted in Nevada in 1951. In reviewing the database of reported Nevada cases since the year 1945, the first case involving CSA appears in the year 1964. Since 1964, and through 1989, there have been a total of thirty-eight such reported cases, all of which were criminal, and twenty-four of which were decided since 1980. It is logical to infer from the foregoing statistics that criminal prosecutions in Nevada involving CSA have greatly increased during the last two decades. It is also logical to conclude that the Legislature did not specifically contemplate CSA within the "wrongful acts" terminology of the statute when it was enacted in 1951.

We think it is safe to assume that the attitudes and policies reflected by our statute of limitations were formulated without concern for the comparatively recent and growing public cognition of CSA and its long-term effects. To this day, the issue evokes a plethora of problems stemming from such factors as the age of child-victims, lack of witnesses, frequent lack of physical evidence, victim defense mechanisms, prosecutorial inexperience, imprecise and controversial investigative and therapy methodology, parental responses and involvement, tension between an accused's right of confrontation and compounding the extent and duration of trauma to the child-victim, hysteria, length and adversarial nature of judicial proceedings, and fear. Although the foregoing factors and others unspecified primarily impact the complexity of criminal prosecutions, they also affect, in varying degrees and duration, the quality of life of the victims, whether exposed to the criminal justice system or not.

The question thus becomes whether the policies favoring the unenforceability of stale claims should prevail in situations involving adult survivors of CSA. Obviously, the fact that a claim is based upon allegations of CSA does not eliminate or diminish concerns about fraudulent and oppressive claims; nor does it render evidentiary problems resulting from delay less important. On the other hand, where, as here, the *fact* of CSA is clearly and convincingly shown, we find it difficult to place the plight of the abuser in a position of preeminence over that of the victim irrespective of delay. Ofttimes survivors of CSA are beset with such crippling symptoms as guilt, anxiety, embarrassment,

depression, and fear over protracted periods of time.[4] As indicated by the lack of civil actions in Nevada seeking redress against perpetrators of CSA, many survivors of such abuse will complete life's struggle without ever attempting to call their tormentors to account. Others may continue to survive with their fingers in the dike until the pressure becomes too great to bear and they are compelled to find help.

In those instances where the *fact* of abuse is clearly and convincingly corroborated, we perceive no compelling need or policy which justifies the intervention of a period of limitations to eliminate the right of CSA victims to seek recovery against their

[4]In a summary of the long-term effects of CSA, it was noted that:

> Empirical studies with adults confirm many of the long-term effects of sexual abuse mentioned in the clinical literature. Adult women victimized as children are more likely to manifest depression, self-destructive behavior, anxiety, feelings of isolation and stigma, poor self-esteem, a tendency toward revictimization, and substance abuse. Difficulty in trusting others and sexual maladjustment . . . has [sic] also been reported by empirical researchers. . . .

*See* D. Finkelhor, A Sourcebook on Child Sexual Abuse, at 162-63 (1986).
Another research paper, McLeer, Susan V. et al. Post-Traumatic Stress Disorder in Sexually Abused Children, Journal of American Academy of Child and Adolescent Psychiatry 1988, 27, 5:650-54, reported that studies on the impact of CSA reveal that "46 to 66% of sexually abused children demonstrate significant and severe symptoms. . . . Forty to eighty percent of these symptoms are related to anxiety and its associated manifestations of autonomic hyperarousal, avoidant behaviors, and re-experiencing phenomenon . . . symptoms that constitute partial criteria for DSM-III-R [Diagnostic and Statistical Manual (DSM-III-R), American Psychiatric Society, Washington, D.C., 1989] post-traumatic stress disorder (PTSD)." *Id.* at 650. The interviews of CSA victims upon which this study was based were scored according to a checklist with three subcategories of symptoms developed from DSM-III-R criteria for PTSD: "(1) *re-experiencing behavior,* including repetitive talking about the abuse, repetitive play, flashbacks, nightmares, inappropriate sexual activity or talking, and fear of places, people, and things that were viewed as symbolic of the abuse; (2) *avoidant behaviors,* including avoidance of people, places, and things associated with the abuse, an unwillingness to talk about the abuse, no, or limited memory of the abuse, decreased concentration, and lack of interest in activities; and (3) symptoms of *autonomic hyperarousal,* including difficulty falling asleep or staying asleep, irritability, anger and/or aggressive behavior, distractibility, hyperalert, anxious, or startle reactions, and physiological changes." *Id.* at 651-52. The study concluded that 48.4% of the abused subjects met DSM-III-R criteria for PTSD. *Id.* at 652. Finally, the paper noted that other studies indicate that "[a]dult survivors of CSA have demonstrated more symptoms and dysfunction than normal controls, with symptoms clustering in three areas: anxiety and its associate behaviors, depression and associated lowered self-esteem, social and sexual dysfunction. . . ." *Id.* at 650. Continuing, the article observed that "[s]everal investigators have noted that some of these symptom clusters fit DSM-III-R criteria for PTSD, and these data suggest that women may have unremitting PTSD symptoms for years after the experience of CSA. . . ." *Id.*

abusers, irrespective of delay or the time of discovery of the causal connection between the abuse and the injury. In these limited instances where proof of the abuse has not been obscured by the passage of time, the delay can hardly be a source of significant prejudice or disadvantage to abusers. It appears likely that the longer an abuser can defer accountability and enjoy the accrual and use of assets unencumbered by the claims of a victim, the better from the abuser's perspective. Conversely, in many cases, the lives of CSA survivors progressively deteriorate to the point where individual coping is no longer possible or tolerable.[5] We do not agree with the proposition that CSA victims who have avoided litigation or exposure for extended periods should be sacrificed for a policy disfavoring stale claims or the disturbance of abusers who have grown accustomed to living free of concern over an eventual day of reckoning with their victims.

Moreover, in these unique cases where clear and convincing proof of CSA exists, adoption of the discovery rule would produce some untoward, if not bizarre, possibilities. First, in undoubted instances, the complex of emotions burdening victims may be exacerbated by forcing them to prematurely confront their abusers in order to preserve their prospects for redress. Second, a victim's suffering may be intensified by the realization that his or her failure to timely muster the will or the courage to seek relief from the abuser has left the latter forever immune from civil accountability. Third, it is reasonable to assume that certain victims, when informed of the discovery rule, will add to their inner turmoil by dissembling in order to avoid the bar of the statute. Fourth, under the discovery rule, the CSA victim will be subjected to the ultimate irony of having to demonstrate his or her

---

[5]In a report reflecting a basic consensus between psychiatrists and psychologists reviewing all relevant data for diagnostic purposes, symptoms identified as characteristic of post-traumatic stress disorder included: depression and anxiety, a sense of a foreshortened future, psychic numbing, conscious and pervasive fear, recurrent nightmares and hypervigilence. The report also observed that

> Symptoms usually begin immediately or soon after the trauma. Reexperiencing symptoms may develop after a latency period of months or years following the trauma, though avoidance symptoms have usually been present during this period.
> Impairment may be either mild or severe and affect nearly every aspect of life. Phobic avoidance of situations or activities resembling or symbolizing the original trauma may interfere with interpersonal relationships such as marriage or family life. Emotional lability, depression, and guilt may result in self-defeating behavior or suicidal actions. Psychoactive Substance Use Disorders are common complications.

Diagnostic and Statistical Manual (DSM-III-R), American Psychiatric Society, Washington, D.C., 1989, pp. 248, 249.

integrity in claiming the benefit of the rule. The thrust of the action will shift from the actions of the abuser and the injuries of the victim to matters of proof concerning the victim's allegations regarding either the actual date and circumstances of discovery or worse yet, the time when the victim reasonably should have discovered that the abuser's conduct was the source of his or her emotional and mental distress.

Although we do not suggest that Petersen has dissembled in his effort to secure passage through the barrier of the statute, the sworn allegations of his affidavit are illustrative of the irony of his position. By averring that he had blocked from his memory the incidents involving Bruen until recall was achieved in the course of therapy, Petersen has sought to place himself within the ambit of the discovery rule. Moreover, he seeks to buttress the believability of his period of forgetfulness by alleging that he did not perceive the acts to be offensive at the time of their occurrence, that he consented thereto and was not physically injured as a result. In other words, at the time of Bruen's perfidy, Petersen was not sufficiently traumatized or impressed with the wrongfulness of the acts to make their repression particularly difficult.

The spectacle thus produced by the discovery rule is one of transmogrification, with the victim trying to convince the trier of fact that he has not now become an abuser of truth as an expedient to achieve requital against his former tormentor. And, because proof of discovery in these types of cases must depend in large measure on an inexact science dealing with the psyche, an anticipated conflict of expert opinion will add a further dimension and obstacle to the victim's attempt to reach first base.

We readily concede that in other instances where the discovery rule is applied, the burden shifts to the plaintiff to prove the time and method of discovering the injury. In many such cases, however, objective evidence exists to help meet the burden. In cases of CSA survivors, virtually the only means of sustaining the burden is to convince the trier of fact that the plaintiff's mentation repressed the acts of abuse or their deleterious effects over a certain period of time. The fact that a CSA survivor may have been mentally and emotionally incapable of asserting his or her claim within the statutory period would have no relevance under the discovery rule.

Unlike almost all other complainants subjected to statutes of limitation, child victims of sexual abuse suffer from a form of personal intrusion on their mental and emotional makeup that interferes with normal emotional and personality development.[6]

---

[6]In a study involving the development of post-traumatic stress disorder in ten children reportedly sexually abused in a day-care setting, it was observed that "[p]roblems with personal-social relationships appeared to be a perva-

As a result, the adverse effects of such abuse may perceptibly increase for prolonged periods, if not an entire lifetime. And, although physical trauma and injury present in other torts may result in a gradual physical deterioration with concomitant emotional distress, such actions usually are not complicated by the stigma, fear and depression associated with CSA.

In short, adult survivors of CSA present unique circumstances and injuries that do not readily conform to the usual constructs upon which periods of limitations are imposed. In a sense, such survivors are analogous to victims of false imprisonment, where each new day of confinement creates a new cause of action. Unfortunately, however, CSA survivors are hostage to their own thought processes, implanted by their abusers, and from which they may never be totally released. Indeed, the mental and emotional dysfunction suffered by such victims may virtually prevent them from seeking relief against their tormentors until the period of limitations has long since expired. To place the passage of time in a position of priority and importance over the plight of CSA victims would seem to be the ultimate exaltation of form over substance, convenience over principle.

Based upon the foregoing, we hold that no existing statute of limitations[7] applies to bar the action of an adult survivor of CSA when it is shown by clear and convincing evidence that the plaintiff has in fact been sexually abused during minority by the named defendant.[8] Absent such evidence, a cause of action based

sive area of difficulty." The paper also noted that "[o]n the Minnesota Child Development Inventory, the children were found to be functioning in the lower 10% of children their age in personal-social development." The study also stated that the fearfulness present in the children "appeared to represent collapse of developmental accomplishment." Kiser, Laurel J. et al. Post-Traumatic Stress Disorder in Young Children: A Reaction to Purported Sexual Abuse. Journal of American Academy of Child and Adolescent Psychiatry, 1988, 27, 5:645-649.

Moreover, in the article by McLeer, et al. (*see* footnote 4), it was concluded that "[i]t may well be that sexually abused children with PTSD are at risk for symptom and/or disorder persistence, perhaps even from childhood into adulthood." *Id.* at 653.

[7]At common law there was no fixed period of time that limited an aggrieved party's right to maintain an action. *See, generally,* 51 Am.Jur.2d, *Limitation of Actions* § 1 (1970); 54 C.J.S. *Limitations of Actions* § 2 (1987). As observed previously, we feel assured that the legislature did not contemplate or consider the unique aspects of CSA cases in fixing general periods and categories of limitations.

[8]We are confident that the legislature will take such measures as it may deem advisable to address the instant ruling if it determines that demonstrated survivors of CSA should be limited in the time within which enforceable actions may be pursued.

upon allegations of CSA will be subject to the regular two-year period of limitations specified currently under NRS 11.190(4)(e).

We recognize that injustice may result from our ruling in instances where CSA has occurred but cannot be demonstrated by corroborative evidence that is clear and convincing. We are persuaded, however, that the potential for fraudulent claims is sufficiently great to warrant such a ruling, at least until such time as the legislature may elect to provide a period of limitations directly addressing this specific problem. Because CSA will most often occur under circumstances which are difficult to prove, we would encourage the legislature to enact legislation designed to provide the maximum opportunity for justice in these most difficult types of cases.[9]

## Conclusion

For reasons hereinbefore stated, we conclude that Petersen demonstrated by the requisite showing of clear and convincing evidence that he was in fact sexually abused as a child and that Bruen was his abuser. Therefore, the district court erred in dismissing Petersen's complaint. The judgment is reversed and the matter remanded for trial.

Young, C. J., and Mowbray, J., concur.

Rose, J., concurring:

I concur in the result reached in the majority opinion. However, I would prefer to adopt a rule that tolls the running of the statute of limitations until the discovery of the cause of the victim's psychological problems as has been done in cases from other jurisdictions such as Hammer v. Hammer, 418 N.W.2d 23 (Wis.Ct.App. 1987), *rev. denied,* 428 N.W.2d 552 (Wis. 1988), and Meiers-Post v. Schafer, 427 N.W.2d 606 (Mich.Ct.App. 1988); or until the victim can psychologically address his child sexual assault (CSA) and assert it publicly. Since Petersen's discovery of the causal connection between his psychological problems and the CSA occurred in 1987 and his complaint was filed in July, 1988, the lower court may well find that this action was timely filed if the running of the statute of limitations is tolled until the discovery of the cause of the injury. The lower court could also find that sufficient evidence supports a claim that Mr. Petersen could not psychologically confront and make public the prior CSA until shortly before the complaint was filed. Neither

---

[9]For example, the legislature may determine that alleged victims of CSA who do not have clear and convincing evidence of the fact of their abuse should nevertheless be entitled to the benefit of the discovery rule. The Washington statute cited in footnote 3 above is an example of a statute that would provide such a benefit.

factual determination has been made in this case. I would also apply the tolling of the statute of limitations as stated in all CSA cases, whether the assault was established by clear and convincing evidence or simply by a preponderance of the evidence.

The majority opinion is very persuasive in advocating the elimination of the statute of limitations in all CSA cases where the assault can be established by clear and convincing evidence. However, I would defer the decision on the actual adoption of that position, in this or a later case, until this court is presented with a child sexual assault case that is determined to be barred by the statute of limitations even after application of the above stated rules.

SPRINGER, J., concurring and dissenting:

I agree with the majority opinion that a "discovery" rule in these kinds of cases is unrealistic. I disagree, however, with the majority's attempt to annul the statute of limitations in civil cases arising out of child sex abuse cases. I dissent from the majority opinion in this regard and, therefore, from the decision to reverse.

The legislature may choose to eliminate the statute of limitations with respect to child abuse cases. I do not think that the court should be making these kinds of major policy decisions. I find the reasoning in support of doing away with the statute of limitations to be hard to follow and a bit contrived.